witkowlaw | a professional law corporation
Brandon J. Witkow (SBN 210443)
bw@witkowlaw.com
21031 Ventura Boulevard, Suite 603
Woodland Hills, California 91364
Tel:   818.296.9508
Fax:   818.296.9510

OSBORNE LAW LLC
John W. Osborne (*Admitted Pro Hac Vice*)
josborne@osborneipl.com
33 Habitat Lane
Cortlandt Manor, New York 10567
Tel:   (914) 714-5936
Fax:   (914) 734-7333

*[Additional Counsel located at conclusion of document]*

Attorneys for *Plaintiff and Counter-Defendant*
AMERANTH, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERANTH, INC., a Delaware corporation, | ) Case No. SACV11-0189-AG (RNBx) |
| | ) [consolidated with 8:13-00720-AG-RNB] |
| Plaintiff, | ) |
| vs. | ) |
| GENESIS GAMING SOLUTIONS, INC., et al., | ) Honorable Andrew J. Guilford |
| | ) |
| Defendants. | ) **AMERANTH, INC.'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '969 PATENT** |
| AND RELATED COUNTERCLAIMS. | ) Date:    Nov. 10, 2014 |
| | ) Time:    10:00 AM |
| | ) Place:    Courtroom 10D |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   OVERVIEW ........................................................................................................... 1

III.  FACTUAL BACKGROUND. ................................................................................. 6

    A.  The Prior Art Included Only Some Disparate, Non-Integrated
        Manual Systems For Wait-Listing And Player Compensation. ................. 6

    B.  The Inventions Of The '969 Patent Introduced The First Ever
        Integrated System for Poker Rooms -With Wholly New Elements
        and Devices With No Pen-And-Paper Analogues, And Thus
        Transformed The Way Poker Rooms Are Managed. ..................................... 8

IV.   LEGAL ARGUMENT ........................................................................................... 12

    A.  Legal Standard. ................................................................................................ 12

    B.  The Claims Are Not Directed To Any Abstract Idea and Most
        Definitely Not Fundamentally To A "Customer Loyalty Program." ........ 13

        1.  Defendants Fail To Articulate An "Abstract Idea" That
            Remotely Resembles The Claims. ....................................................... 13

        2.  The Claims Are Not Directed To An Abstract Concept. ................. 15

        3.  The Inventions Do Not Preempt Defendants' Alleged
            "Abstract Idea." ..................................................................................... 18

    C.  The Inventive Concepts Of the Claims Transform The Claims Into
        Eligible Subject Matter. ................................................................................. 20

V.    CONCLUSION ....................................................................................................... 25

witkow law

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

4

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*
   728 F.3d 1336, 1341 (Fed. Cir. 2013)..................................................12

5

*Alice Corp. Pty. Ltd. v. CLS Bank Intern*
   134 S. Ct. 2347, 2354 (2014) ..............................................passim

6

7

*Association for Molecular Pathology v. Myriad Genetics, Inc.*
   133 S. Ct. 2107, 2109 (2013) ...........................................5, 16

8

*Bilski v. Kappos*
   561 U.S. 593, 610-611 (2010)..................................3, 16, 17

9

10

*buySAFE, Inc. v. Google, Inc.*
   765 F.3d 1350, 1355 (Fed. Cir. 2014)...........................16, 17

11

*Microsoft Corp. v. i4i Ltd. P'ship*
   131 S. Ct. 2238, 2242 (2011)..........................................12,13

12

*Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.*
   558 F.3d 1341, 1349 (Fed. Cir. 2009) .............................12

13

14

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*
   717 F.3d 1269, 1304–05 (Fed.Cir.2013) .........................13

15

*Diamond v. Chakrabarty*
   447 U.S. 303, 309 (1980) ..................................................16

16

17

*Diamond v. Diehr*
   450 U.S. 175, 191–192 (1981) ..........................................3

18

*Eastman Kodak Co. v. Image Technical Services, Inc.*
   504 U.S. 451, 456 (1992) ..................................................12

19

20

*Helios Software, LLC v. SpectorSoft Corp.,*
   2014 WL 4796111, *17 (D. Del. Sept. 18, 2014) ..........16, 18

21

*Jones v. Hardy*
   727 F.2d 1524, 1528 (Fed. Cir. 1984) ...............................2

22

23

*KSR Int'l Co. v. Teleflex Inc.*
   550 U.S. 398, 421, (2007) .................................................11

24

*Marine Polymer Techs., Inc. v. HemCon, Inc.*
   672 F.3d 1350, 1368 (Fed. Cir. 2012)...............................2

25

26

*Mayo v. Prometheus*
   132 S. Ct. at 1294...................................................11, 12, 23

27

*McRO, Inc. v. Namco Bandai Games America, Inc.*
   2014 WL 4749601, *6 (C.D.Cal., Sept. 22, 2014).............5

28

ii

*O'Reilly v. Morse*
  15 How. 62, 113 (1854)...................................................................................5

*Research Corp. Tech., Inc. v. Microsoft Corp.*
  627 F.3d 859, 869 (Fed. Cir. 2010).........................................................23


**Statutes**

35 U.S.C. §101.........................................................................................12

35 U.S.C. §103...........................................................................................3

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In their Motion, Defendants argue that the '969 patent is directed to the abstract idea of a "customer loyalty program directed to poker players," and that the patent merely took the prior art pen-and-paper implementation of this idea, and claimed performing it on a computer.  (Mot. at 8).  However, Defendants grossly mischaracterized the highly detailed claims of the '969 patent, which require far more than a "customer loyalty program."  Moreover, all the claims include numerous innovative concepts and specialized hardware devices that have no analogue in the "pen-and-paper" prior art.  The synchronized and integrated system of the '969 patent replaced the balkanized processes that Defendants' own cited art (Carson) described as "chaotic," and transformed the operation of poker rooms.  Thus, Defendants' motion fails at both steps of the *Alice* test: the claims are not directed to an "abstract idea," and even if the Court were to conclude that they are, the claims contain numerous "inventive concepts" that amount to "significantly more" than a patent on that abstract idea.  *See Alice Corp. Pty. Ltd. v. CLS Bank Intern*, 134 S.Ct. 2347, 2354 (2014).  Thus, Defendant's motion must be denied.

## II.   OVERVIEW

The first four pages of Defendants' brief involve an irrelevant digression about privilege issues raised in the deposition of Ameranth's litigation and prosecution counsel, and the extent to which the named inventors were involved in the prosecution of the '969 patent.  As Genesis fails to explain the relevance of these matters to patent eligibility under §101, Ameranth will limit itself to one brief factual correction:  there was nothing "defective" about Mr. Kessman's declaration (Mot. at 3) because Mr. Kessman submitted that declaration in full compliance with established Patent Office requirements and procedures.   While Ameranth disagrees with other aspects of this narrative, Ameranth will heed the Court's directive to "focus[] on the disputed issues most important to the Resolution of the Motion." [Docket # 151 at 4].

witkow law

Defendants' chief substantive argument is that Ameranth has improperly attempted to patent the abstract idea of a customer loyalty program in a poker room, or a generic computer implementation of one.  The inventions of the '969 patent, however, make no attempt to capture all possible computerized implementations of a "customer loyalty program" in a poker room. In fact, Defendants' analysis of the two independent claims (let alone the forty dependent claims) is so cursory that they failed to notice that the second of the independent claims, claim 27, as well as its dependent claims 28-40 and 42, do not even include a "compensation system", *i.e.*, the "customer loyalty program" that Defendants contend is the "fundamental abstract concept of the claims." (Mot. at 8).[1]  Thus, Defendants' attempt to characterize these claims as covering the "abstract idea" of a customer loyalty program plainly fails.

Moreover, all of the '969 claims cover very specific, narrow combinations of software and hardware, directed not just to "customer loyalty" but to an integrated system that also encompasses, *inter alia*, seating management, table availability, table management, waitlist management, jackpot management, specialized public display hardware/devices, specialized card reader hardware, and numerous other unique features, depending of course on the particular claim.  *See* Mot. Ex. 2 ('969 patent); *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984) ("[E]ach claim must be considered as defining a separate invention."); Declaration of Michael Shamos ("Shamos Decl.") ¶¶15-20, 48, 64.

Defendants are also wrong in their contention that the claims merely automate what was already in the alleged prior art, effectively rearguing arguments they have already lost multiple times.  This motion, of course, is not about anticipation or obviousness, but about patent-eligible subject matter.  Nonetheless, if the Patent

---

[1] Elements "l' and "m" of Claim 1 require a "compensation system." Claim 41, which depends from claim 27, requires a "compensation system."  Under basic claim differentiation principles, however claim 27 itself does not require such a system. *See, e.g., Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1368 (Fed. Cir. 2012).

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT

Office had been convinced that the claims of the '969 patent were directed to the mere obvious "automation" of existing processes, it would have rejected the claims under 35 U.S.C. §103.[2]  Instead, the '969 claims were issued over a very thorough disclosure of the prior art.  The claims were issued by the same Examiner who allowed the `650 and `909 patents, and the '969 Examiner was aware of the three Defendant-filed reexaminations of those patents.  All of the prior art that Defendants cited in those reexaminations, as well as the Reexamination Examiner's analysis, was provided to the '969 Examiner in a November 8, 2012 information disclosure statement. Furthermore, during the pendency of this case, on July 5, 2011, the Defendants themselves filed a third party information disclosure statement against the application that became the `969 patent, disclosing numerous "customer loyalty program" prior art references, including the Hogan reference that Defendants rely on heavily in their Motion. Thus the 42 issued claims of the `969 patent were allowed over not only the prior art identified by Ameranth and the prior art identified independently by the Examiner, but also all of the prior art identified by the Defendants including art directed to "customer loyalty systems."   Based on this prosecution history, Defendants' claims about the scope of the prior art should be viewed from the outset with great skepticism.

In this motion, Defendants rely principally on four references:  the Hogan reference, the Carson book, the 2009 testimony of one of the named inventors

---

[2] The Patent Office could also have rejected the claims under Section 101. While *Alice* makes explicit that "merely requiring generic computer implementation fails to transform that abstract idea into a patent-eligible invention," 134 S. Ct. at 2352, it has long been clear that the prohibition against patenting abstract ideas "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment" or adding "insignificant post-solution activity." *Bilski v. Kappos* 561 U.S. 593, 610-611 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175, 191–192 (1981).

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT

witkow law

(Kessman),[3] and the '969 specification itself.[4]   Two of their references should be excluded as hearsay, and one is excluded by the Court's Claim Construction Order as discussed in Section III.A below, leaving only the "Background" section of the `969 patent itself as properly citable. However, a "Background," by definition, is not what the inventors considered to be their invention, and further was presumptively considered by the Examiner who allowed the claims.

These four references, alone or in combination, do not describe or suggest the inventions recited with great specificity in the claims of the patent, nor do they teach a pen-and-paper analogue to the very detailed and specific claims of the '969 patent, as Defendants suggest.  Indeed, the references, if anything, serve to *confirm* that the '969 patent claims far more than the mere automation of prior art processes. Moreover, Hogan is completely outside the context of the poker rooms to which the '969 patent applies.  Hogan discusses "comp" systems (one narrow aspect of the '969 method claims) but only for games that are played *against the house.* However, the Court's Claim Construction Order, which appears to have been ignored by Defendants, limits the claims of the '969 to player-against-player poker games, which excludes references such as Hogan. [*See* Docket. # 164 at 41].  There is a significantly different context for poker room operational management as compared to non-poker table games, as explained further below.  Indeed, Defendants' attempt to rely on Hogan underscores another manifestation of their cursory analysis – Defendants' motion for

---

[3] The Kessman testimony is from a different, non-patent, proceeding in which Mr. Kessman was adverse to Ameranth, and is therefore plainly inadmissible hearsay, as further set forth in Ameranth's evidentiary objections.

[4] Defendants also briefly reference comments in an email made by a non-technical Ameranth salesperson (Ron Yanik).  Defendants' claim about this document is illogical: Defendants argue that since Ameranth's product embodied some aspects of the '969 patent, and since Mr. Yanik described Ameranth's product as performing "automation," the '969 patent must therefore do nothing but "automation."  Of course, Mr. Yanik was not making any attempt to fully describe the improvements of the inventions of the '969 patent over the prior art, nor would he have been qualified to do so. (McNally Decl. ¶ 5; Watts Decl., Exh. 8 (McNally depo trans.), at pgs. 12, 21).

4

summary judgment does not include a single reference to the Court's Claim Construction Order.

Defendants completely fail to show that the '969 patent is outside of the realm of patentable subject matter. The consistent touchstone of the Supreme Court's jurisprudence regarding patent eligibility under § 101 is that the patent system should not grant a monopoly over "the basic tools of scientific and technological work," lest the patent system tie up the "building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Intern*, 134 S. Ct. 2347, 2354 (2014) (quoting *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2109 (2013). Ameranth's '969 patent covers highly popular and commercially successful hardware and software suites for casino poker game management, but it is not, Ameranth will freely admit, one of the "building blocks of human ingenuity." For example, there are an infinite number of possibilities for implementing a "customer loyalty program directed to poker players," with or without a computer. Ameranth has claimed one, as part of an integrated system with numerous other features and functions. Indeed, the accused Genesis poker room management product indisputably has customer loyalty features, yet Genesis vehemently denies infringement. By Genesis' own admission, then, the '969 patent has not preempted the field of computerized customer loyalty programs in poker rooms. "It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea," but "the patent law does not privilege the leisure of an infringer over the labors of an inventor." *McRO, Inc. v. Namco Bandai Games America, Inc.*, 2014 WL 4749601, *6 (C.D.Cal., Sept. 22, 2014) (citing *O'Reilly v. Morse*, 15 How. 62, 113 (1854)). Because the '969 patent does not claim an "abstract idea," and includes numerous inventive concepts that amount to "significantly more" than simply the notion of a computerized customer loyalty program, the subject matter is patent eligible and the motion for summary judgment must be denied.

**AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT**

**III.   FACTUAL BACKGROUND.**

   **A.   The Prior Art Included Only Some Disparate, Non-Integrated Manual Systems For Wait-Listing And Player Compensation.**

In the book cited by Defendants (*see* Evidentiary Objections, filed concurrently herewith) as alleged prior art entitled "The Complete Book Of Hold 'Em Poker: A Comprehensive Guide to Playing and Winning", the author, Gary Carson, noted: "When you walk into a large card room for the first time, it can appear to be chaotic. The noise and the people can be disorienting." (Motion, Exh. 10, pg. 18). And this was, indeed, the state of the prior art: chaos and disorientation.

The specification of the '969 patent explained some of the disparate, paper-based processes in place in the poker rooms which existed at the time. For example, in describing the prior art, the specification of the '969 patent explained that "[t]o play a game at a table in a poker room, Players are placed upon waiting lists by Clerks and are called (by voice, or microphone) once their opportunity to enter a game arises. Clerks maintain a waiting list via pencil, pen, and paper methodology." (Mot., Exh. 2 ('969 Patent) at 4:38-45). The patent also explained that "Casinos sometimes offer Players compensation for playing. Floor Persons are responsible for oversight of Players' durations and level of play." (*Id.* at 4:44-45.) But these were two completely separate manual processes. Nothing in the '969 patent specification, and no evidence submitted by Defendants, suggests that these manual processes of managing wait lists and of offering Player compensation were integrated in any way.

Defendants rely on the Hogan '671 reference to suggest that it was known to have a casino employee evaluate the average wagers of a player, input information about those wagers into a database, and use that system to assess "comp," or compensation. (Mot. at 10-11.) To understand the limitations of Hogan '671 as a purported prior art reference, it is first important to understand the very different context to which Hogan applies. Hogan applies only to games that are played against

**AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT**

the "house," rather than player-against-player games.[5]  The '961 patent, by contrast, applies to player-against-player games.  [*See* Docket # 164 (Claim Construction Order) at 42 (construing preamble of '969 patent claim 27 as "The software and electronic devices for monitoring players who play poker games at gaming tables **against other players** in a physical casino.") (emphasis added); *see also id.* at 41 (construing similar terms of the '650 patent in the same way)]. Defendant Genesis's CEO, Randy Knust, and its technical expert and lead software developer, Eric Schoppe, concur that poker is different from games such as those to which Hogan was directed, because poker is not a game in which players play against the house. (Declaration of Ethan Watts ("Watts Decl."), Exh. 6 (Knust Ind. Dep. Tr. 1-31-14 at 109:1-112:3), Exh. 7 (Schoppe Ind. Dep. Tr. 8-14-14 at 106:4-109:19)). Thus the top executives of Genesis admit that the Hogan reference teachings are not applicable to the context to which the `969 patent claims are limited.

        The reason that the distinction between playing against other players and playing against the house matters is that the technical requirements of, and systems used in connection with, the poker games to which the '969 is directed are substantively different from those of the non-poker table games to which the Hogan reference is directed.  As just one example, waitlists are not even used for table games, as is confirmed by the absence of any waitlisting functionality whatsoever in Hogan. (Declaration of Keith McNally ("McNally Decl."), ¶ 7).   Compensation also works differently.  A poker room makes money by, in essence, renting the seat to the poker player by collecting a portion of "antes" for each hand.  Thus, the casino makes its money by keeping seats full, regardless of the amounts that players are betting. (McNally Decl., ¶ 6; Watts Decl., Exh. 6 (Knust Ind. Dep. Tr. 1-31-14 at 111:3-112:3;

---

[5] The Hogan specification does make reference to "Caribbean Stud Poker, Caribbean Draw Poker, Let It Ride, and Wheel and Deal," but as a person of skill in the art would instantly recognize, those games are simply variants of "table games" where players play against the "house," and do not refer to player-against-player poker as required by the Court's claim construction. (*See also* McNally Decl., ¶ 7).

**AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT**

138:1-140:2).)  By contrast, in games such as blackjack where the player plays against the house, the casino can make more money in five minutes of large bets than in two hours of small bets.  Thus tracking of play for a blackjack player, for compensation and other purposes, involves tracking the amount bet, because that is what determines the casino's profit.  (McNally Decl. ¶¶ 6, 7; Watts Decl., Exh. 6 (Knust Ind. Dep. Tr. 1-31-14 at 109:1-112:3).)

Once the different context of the Hogan reference is appreciated, it is readily apparent why the reference is inapplicable to the claims of the '969 patent, which are expressly limited under the Court's constructions to player-against-player poker games, time based compensation, and include core features including waitlist management and public display of waitlists that have no applicability to the types of table games discussed in Hogan '671.  Indeed, the '969 patent was expressly issued over the Hogan '671 reference, confirming that the patent Examiner appreciated these differences as well. (Mot., Exh. 2 ('969 patent – cover page).)

### B. The Inventions Of The '969 Patent Introduced The First Ever Integrated System for Poker Rooms -With Wholly New Elements and Devices With No Pen-And-Paper Analogues, And Thus Transformed The Way Poker Rooms Are Managed.

In the context of the player-against-player poker room, the prior art, as discussed above consisted, at most, of disparate, manual processes for only a few of the claimed functions such as waitlist management and compensation.  The reason that these prior art manual processes were not integrated is that there were gaping holes in these *manual* processes that prevented such integration and the lack of the specialized devices and functionality which was conceived by the inventors of the `969 patent.

For example, nothing in the prior art cited by Defendants shows that anyone attempted (whether mentally, through paper files, or otherwise) to provide a comprehensive poker room customer list/database that was integrated with the

independent wait list and the specialized requirements of poker player time-based compensation processes.  The pen-and-paper wait list referenced in the '969 specification was merely a list of the people who were <u>currently</u> waiting, not a list or database of all of the thousands of poker room's users/players, whether waiting, playing, or not currently in the casino.  Thus, the "player database," as recited in the claims of the '969 patent, simply had no pen-and-paper or mental analogue.

Similarly, there was no attempt to maintain an ongoing database (through pen and paper or otherwise) of table availability.  Casino staff would simply "look around" periodically to the limits of their eyesight or listen to the limits of their hearing, and if they saw an empty seat or if they heard a "shout out" from other casino employees, they would then "shout out" the name of the next person on the list to other casino staff, who may or may not then have heard the additional "shout outs." (McNally Decl. ¶ 9).   This was one aspect of the "chaos" and "noise" described in the Carson prior art.  Critically, if the casino employee was distracted, or a table was obstructed from view, or if multiple "shout outs" occurred simultaneously, the fleeting "table availability data" was simply lost and no longer existed, not even in the minds of the staff.  Thus, the "table availability database," as envisioned and claimed in the inventions of the '969 patent, also had no pen and paper or mental analogue in the prior art cited by Defendants.

By systematically tracking, organizing, storing and monitoring this transient, ever changing, information (as taught in the '969 patent), numerous further improvements were made possible, as reflected in the `969 claims, all of which  have no analogue in the pen-and-paper prior art.  For example, claim 1 of the '969 patent requires "displaying indicia identifying said particular player on a public waitlist display, said public display including the display of information comprising <u>at least two different poker game types</u> and waiting players for each game type and wherein said public display is suitable for viewing by a multiplicity of players or prospective players throughout the poker room."  Independent claim 27 similarly requires a

"public display" with "at least two different poker game types and waiting players for each game type." Defendants do not point to anything in the prior art that provides this type of unique display functionality.  Carson contains a single vague reference to "computerized lists" on "monitors scattered around the room." Mot. Ex. 10 at 19-20. But it is unclear from the reference what those "computerized lists" were or how they were created, and Ameranth disputes that this statement in the book is, by itself, clear and convincing evidence of anything regarding the scope and content of the prior art. Certainly, it is not a disclosure of the very specific type of display and display functionality required in the claims. Nothing in Defendants' alleged prior art discloses a public display suitable for viewing "throughout the poker room" that coordinates and displays wait list information for multiple poker game types.

The narrow and specific claim elements of the independent claims of the '969 patent are only made possible by the unique integration of the recited player database, table availability database, seating management functionality including game type preference, waitlist functionality, and the specially configured public display device functionality including display of multiple game types, as discussed in Section IV.C below.  Nothing similar existed nor was possible with prior art, disparate pen-and-paper processes.  As Ameranth explained during prosecution of the patents in suit, "[t]he instant invention is directed to proving a waitlist and a display system that enables **hundreds or thousands** of potential players to see where their names appear on large public display devices." (Emphasis added) (Watts Decl., Exh. 9 at AMERANTH00001992).  Such real-time coordination of hundreds or thousands of players was simply beyond the capabilities or imagination of casino staff managing small portions of a poker room by writing names on pieces of paper and shouting when seats became available.  The inventions of the '969 patent fundamentally changed the way a large poker room could be run.  Nothing even remotely akin to such a multiply-integrated system for providing this specific functionality is disclosed in the prior art cited by Defendants.

10

It is certainly possible to see, with the benefits of twenty-twenty hindsight, the benefits of synchronizing a player database and a table availability database and leveraging this information to provide further unique functionality like the above-described specialized multi-poker game display, shown on the uniquely inventive public displays. The Supreme Court, however, has warned of the dangers of evaluating obviousness in hindsight. *See KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 421, (2007) ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.")., The same degree of caution must naturally apply to the "inventive concept" analysis articulated as "step two" of the *Mayo* and *Alice* test for patent eligibility. *Alice,* 134 S. Ct. at 2357 (citing *Mayo*, 132 S.Ct. at 1303).

When the provisional application for the '969 patent was filed in 2002, computers and databases had been around for decades, and some casino processes were computerized. But nobody else had had the unique insight of Messrs. Kessman and McCauley in developing their QueueOS system invention tailored to provide functionality unique to the "player against player" nature of poker rooms, that by adding and integrating certain particularized elements to a poker room operations management system, including a player database, a table availability database, and a public display device showing and tracking multiple game types for a multiplicity of players throughout the poker room, the disparate prior art processes within a poker room operation could be integrated and improved, and the then-prevailing "chaos" of a poker room all but eliminated. (Shamos Decl. ¶¶18-20, 64). Within a short period of time, these technologies became industry standards, including adoption by the World's largest poker room (defendant Commerce Casino), World's largest Casino Chain (Harrah's) and widespread copying by competing vendors, including Defendants Genesis and ITCS. (McNally Decl. ¶ 10). The intellectual property rights that Ameranth purchased in this highly successful commercial system should not be swept aside as an "abstract idea."

11

## IV.   LEGAL ARGUMENT

### A.   Legal Standard.

The Supreme Court in *Alice* articulated a two-step framework for analyzing patent-eligibility under 35 U.S.C. §101.  First, the Court must determine whether the claims at issue are directed to "patent-ineligible concepts," namely, "laws of nature, natural phenomena, and abstract ideas."  *Alice,* 134 S. Ct. at 2355.  If so, the Court conducts a search for an "inventive concept", an "element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* (*quoting Mayo,* 132 S. Ct. at 1294).  In this second step, the claim elements must be considered both "individually" and "as an ordered combination" to determine whether the "additional elements," i.e., those that go beyond the patent-ineligible concepts, "transform the nature of the claim" into patent-eligible subject matter.  *See id.*

Patent eligibility is a legal question that may contain underlying factual issues. *See Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).  For example, to the extent that the Court reaches step two of the *Alice* framework, and conducts its search for the "inventive concept" by considering the scope and content of the prior art, the Court will necessarily reach factual issues. *Cf. Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.,* 558 F.3d 1341, 1349 (Fed. Cir. 2009) (in obviousness analysis, "underlying factual questions include the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art.").  On summary judgment, inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456 (1992).

Ameranth contends that, because they are attacking the validity of an issued patent, Defendants have the burden to prove invalidity by clear and convincing evidence. *Cf. Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) ("We

12

witkow law

consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does."). The law on this question is, admittedly, unsettled.  In the fractured *en banc* opinion of the Federal Circuit that preceded the Supreme Court decision in *Alice,* the concurrence by Judges Rader, Linn, Moore, and O'Malley held that §101 challenges must be proved by clear and convincing evidence. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269, 1304–05 (Fed.Cir.2013) (en banc) (Rader, J. concurring).  The Supreme Court did not take up this issue in its opinion.  Defendants note that in *Microsoft Corp.,* Judge Breyer wrote in his concurrence that "the evidentiary standard of proof applies to questions of fact and not to questions of law." *See* Mot. at 5 (*citing Microsoft Corp.*, 131 S. Ct. at 2253 (Breyer, J. concurring)).  As explained above, however, the § 101 analysis often involves factual issues, as is plain from Defendants' brief, which spends pages upon pages quoting from alleged prior art references and characterizing the scope and content of the prior art.  Thus, the clear and convincing standard should apply.

### B.    The Claims Are Not Directed To Any Abstract Idea and Most Definitely Not Fundamentally To A "Customer Loyalty Program."

The first step of the two-step *Alice* analysis requires the Court to determine, separately, whether the forty two claims of the '969 patent are directed to an "abstract idea."  Because the claims are plainly not directed to an "abstract idea," the inquiry must end, and Defendants' motion must be denied.

#### 1.    Defendants Fail To Articulate An "Abstract Idea" That Remotely Resembles The Claims.

Defendants contend that the "abstract idea" of the systems and methods claimed in the '969 patent is a "customer loyalty program directed to poker players."  But a customer loyalty (or compensation) program is *one* aspect of only *some* of the claims.  As noted above, the system claim (claim 27), does not even require a "compensation

13

system," a feature that is only added in dependent claim 41. At the same time, Defendants fail to explain how, for example, the "abstract idea" of a "customer loyalty program" encompasses within it a requirement of *both* independent claims, namely, a "public display" that shows "information comprising at least two different poker game types and waiting players for each game type" and that is "suitable for viewing by a multiplicity of players or prospective players throughout the poker room." Not only is this specialized piece of computing hardware (with associated processors, memory, input/output and of course a display) and integrated software functionality anything but "abstract," its purpose is completely orthogonal to any customer loyalty function.

And these exemplary flaws in Defendants' proposed articulation of the "abstract idea" of the patent relate only to the broadest, independent, claims. Dependent claim 3, for example, requires "receiving said check in input and check out input from a card reader which reads a card containing player identification information." This very specialized piece of hardware with integrated software functionality is anything but "abstract." Or, taking another example, claims 18 and 40 require "providing an active dealer display" or providing "functionality of active dealer display." The agreed-upon construction of this term, which was adopted by the Court, is "providing a display of the current active dealer servicing the game at a particular table." [Docket # 164 at 42]. This is yet another very specialized combination of hardware and software, with a function completely different and unrelated to customer loyalty. (McNally Decl. ¶ 11; Shamos Decl. ¶38)**.** Defendants glibly assert, in a single sentence in an exhibit to their motion, that "[t]he abstract concept of having a dealer display such as a name tag on a dealer, was practiced long before 2002." Mot. at Ex C, p. 44. Defendants do not even bother to provide the requisite factual support for this assertion, but even assuming that dealers did in fact wear name tags before 2002, those name tags served a wholly different function from the claimed "active dealer display" functionality. A name tag provides the name of the person to whom it is physically attached. The active dealer display shows patrons

and staff the name of the person who, according to the casino, is the active dealer servicing that game at that particular time. Further and most importantly, by displaying the "active dealer" on the display it is confirmation that the dealer is registered and operational at that table and thus that play at the table is possible/ready. A person of skill in the art would immediately recognize the difference in functionality between a physical name tag and an active dealer computer display. (McNally Decl. ¶ 11; Shamos Decl. ¶38).

As a further example, claims 2 and 29 requires subtracting time a player spends away from the table from the calculation of elapsed time or tracking a particular player to a particular seat. This functionality inherently requires an "at the table" device with the specialized function of tracking when a player is playing, as detailed in the '969 specification:

> "Away Status Button"
> Indicate and record when a player is/is not absent from an active game session (e.g., the player momentarily left the table, the player ha[s] paused play for some reason). A toggle button may be used to easily toggle a player's "away status", and thereby record whether the player is actively playing at any time.

'969 21:43-49. This "toggle button" is a software-enabled physical hardware device specially made to provide this particular, unique functionality. (*See also* Shamos Decl. ¶23).

Thus, Defendants' claim that the '969 invention is nothing more than a computerized implementation of a "customer loyalty program directed to poker players" is simply wrong.

## 2.     The Claims Are Not Directed To An Abstract Concept.

The reason that Defendants fail to accurately articulate an "abstract idea" to which the claims are supposedly directed is because there is none.  The claims of the '969 patent narrowly claim a complex, multi-featured system of and software and

specialized hardware.  As such, the claims of the '969 patent are fundamentally different from the types of claims that prior cases have held to be patent-ineligible.

The Supreme Court has emphasized that the patent system should not grant a monopoly over "the basic tools of scientific and technological work," lest the patent system tie up the "building blocks of human ingenuity."  *Alice*, 134 S. Ct. at 2354 (2014) (*quoting Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2109 (2013).  As the Supreme Court has held*,* "Einstein could not patent his celebrated law that $E = mc\,2$; nor could Newton have patented the law of gravity." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).  Plainly, the '969 patent is not attempting any such thing.

In *Alice,* the Supreme Court held that "[o]n their face," the claims at issue were "drawn to the concept of intermediated settlement, i.e., the use of a third party to mitigate settlement risk." *Alice,* 134 S. Ct. at 2350.  The Court continued that, "[l]ike the risk hedging in *Bilski*, the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce,' and the use of a third-party intermediary (or "clearing house") is a building block of the modern economy." *Id.* (*quoting Bilski*, 561 U.S. at 599). Following this precedent, the Federal Circuit found invalid claims that "are squarely about creating a contractual relationship—a "transaction performance guaranty"—that is beyond question of ancient lineage." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

By contrast, district courts following *Alice* have rejected attacks under § 101 where the accused infringer failed to show that this type of subject matter is at issue. *See, e.g., Helios Software, LLC v. SpectorSoft Corp.*, 2014 WL 4796111, *17 (D. Del. Sept. 18, 2014).  In *Helios,* the challenged patents were "drawn to remotely monitoring data associated with an Internet session and controlling network access." The court rejected that this subject matter was not patentable, holding that the accused infringer "[made] no effort to show that these ideas are fundamental truths or

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT

fundamental principles the patenting of which would pre-empt the use of basic tools of scientific and technological work." *See id.*

There is no "fundamental truth," "fundamental economic practice," "basic tool of scientific and technological work," or "building block of the modern economy" at issue in the '969 patent. Nor is Ameranth attempting to capture a monopoly over any kind of "contractual relationship," of "ancient lineage" or otherwise. Ameranth does not dispute that poker has been played "in gambling houses, riverboats, speakeasies and casinos in the United States for the past three hundred years," Mot. at 15, but Ameranth is certainly not trying to patent poker. Defendants' attempt to characterize the '969 patent as being fundamentally about a "customer loyalty program" is a transparent effort to create a superficial resemblance to *Alice, Bilski,* and *buySAFE,* but for the reasons detailed above, that shoe simply does not fit. Defendants provide no example of a case in which a narrowly-drawn patent like the '969, covering a highly specific combination of software functionalities and specialized hardware, has been invalidated under §101. Because Defendants cannot get past the "first step" of the *Alice* analysis in showing that the claims of the '969 are directed to a patent-ineligible concept, their motion must be denied.

Finally, it is worth noting what *Alice* does and does not say about "software patents." The '969 patent is plainly not a "software patent," as it requires specialized hardware, including, in the independent claims, a "public display suitable for viewing by a multiplicity of players." Nonetheless, it is worth emphasizing that *Alice* does *not* banish all processes performed on a computer. *Alice* holds that if a method is directed to an abstract concept, the "mere recitation of a generic computer" does not transform that abstract idea into patent-eligible subject matter. *Alice,* 134 S. Ct. at 2358. *Alice* does *not* say the converse, namely, that anything implemented on a computer is by its nature "abstract." *See id.* If the Supreme Court had intended to take such a dramatic step in *Alice* as wiping out software patents it would have said so, but it did not. Thus, a patent that has software functionality that is narrowly drawn and does not attempt to,

*e.g.*, claim a monopoly over an entire category of financial transactions, is not "directed to a patent-ineligible concept," and therefore, is statutory subject matter. *See id.* at 2355; *see also Helios,* 2014 WL 4796111, *17.

### 3. The Inventions Do Not Preempt Defendants' Alleged "Abstract Idea."

Another indication that Ameranth's claims are not "abstract" is that they do not preempt all uses of a computer inside a poker room for customer loyalty functions, or for that matter for waitlist, player tracking, table management, or any other claimed functions. *See Alice,* 134 S. Ct. at 2354 (the "concern that drives" the §101 analysis is "one of pre-emption").

For example, it is entirely possible to envision a system that does not perform the claimed step "identifying a particular player in the player database from the player check-in input." Instead, a player could enter his name and preferred game type into a computer, with no lookup of the player in a database. Indeed, this would be much more analogous to the alleged "Rolodex" prior art cited by Defendants. *Mot.* at 9-10. It is also entirely possible to envision a system that does not perform the steps "determining the seating availability for said particular player's poker game type preference from a table availability database including game types in real time" and "adding said particular player to a waitlist for said poker game type preference if no matching table for said game type is currently available." A computerized waitlist function need not necessarily be connected to any computerized table availability function or seat assignment function; instead, every prospective player could be added to the computerized waitlist, and then a human operator could remove people from the waitlist and direct them to tables, without any involvement of the computer in determining or tracking table availability. There also need not be any "real-time" functionality in table assignment: it is entirely possible to have customer loyalty and other functions in a poker room even if seating availability is not determined "within

18

witkow|law

seconds," as the Court's claim construction requires.  [Docket # 164 at 8 (construing "real time")].

Moreover, it is entirely possible to envision a computerized poker room management system that does not perform the claimed step of "displaying indicia identifying said particular player on a public waitlist display, said public display including the display of information comprising at least two different poker game types and waiting players for each game type and wherein said public display is suitable for viewing by a multiplicity of players or prospective players throughout the poker room."  Instead, the system could, for example, page players when it is their turn to play, or use different displays for different game types, or, as in the prior art, staff could simply shout.  Similarly, it is entirely possible to envision a computerized waitlist system that does not require using a "card reader" to obtain "check in input," as required in dependent claim 3.  There are innumerable possible ways to use computers and devices that connect to computers inside a poker room that do not infringe Ameranth's patents.  Accordingly, it cannot be the case that Ameranth has improperly pre-empted an "abstract idea."

The '969 claims in fact encompass only a minute portion of the theoretical number of ways to perform computerized casino operations management. However, Defendants chose to copy the narrowly and specifically recited subject matter of the '969 claims rather than use any of the other innumerable approaches available to them.  That is why they allege that everything they do is "abstract," and that is why they failed to demonstrate abstractness or absence of a practical application of an otherwise abstract process—because what they do, which is coterminous with what the claims recite, is so highly specialized and specific.

## C.   **The Inventive Concepts Of the Claims Transform The Claims Into Eligible Subject Matter.**

As demonstrated above, the claims of the '969 patent are not drawn to an "abstract idea." Thus, the Court need not reach the second step of the *Alice* analysis and search for an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice,* 134 S. Ct. at 2355. If the Court does reach this second step, however, there are ample "inventive concepts" in the claims to demonstrate patent eligibility.

The independent claims contain numerous "inventive concepts," including, among other things, the "player database", the "table availability database," and the integration of the two into a single synchronized system for wait list, table management, player rewards (in claim 1, but not claim 27, as discussed herein), and other functionalities. Nonetheless, the simplest element for demonstrating that the claims amount to more than an "abstract idea" is the requirement, in both independent claims, of a "public display" that includes "information comprising at least two different poker game types and waiting players for each game type" and is "suitable for viewing by a multiplicity of players or prospective players throughout the poker room."

The claimed display is a specialized physical device (*i.e.*, a display large enough to be visible "throughout the poker room"), with integrated software functionality for determining and displaying a very particular set of data, and therefore, not an "abstract concept." Moreover, the claimed does not fall into the category of using a "generic computer to perform generic computer functions." *C.f. Alice,* 134 S. Ct. at 2359-2360. Under *Alice,* a claim that covers the abstract idea of a certain type of economic transaction cannot be saved by reciting a computer, because using a computer to "obtain data, adjust account balances, and issue automated instructions" are all "'well-understood, routine, conventional activities' previously known to the industry." *Id.* at 2359. Defendants have provided no evidence, however,

that the display functionality claimed in the '969 patent was in any way a "conventional" activity known in the industry.  Attaching a specialized peripheral to a computer for a new, unconventional purpose is entirely different from the conventional use of a computer to perform calculations that *Alice* found to be insufficiently "transformative."

Critically, the claims are directed to a unique integration of software and hardware components which provide very specific and particularized casino management capability.  For example, '969 claim elements 1(b)-1(j) and 27(b)-(h) require functionality which can only be provided by the unique integration of the recited player database, table availability database, seating management functionality, waitlist functionality and the specially configured public display device waitlist functionality including display of multiple game types on the public waitlist display, and to do so in real time as claimed. For example, without the player database limitation, there would be no capability to identify prior players and information regarding their past history, including their game type preference.  Without the table availability database limitation, there would be no capability to determine the table availability in real time for the player's poker game type preference.  Without the information obtained from the player database and table availability database, the waitlist/public display device limitation requiring display of multiple game types on the public waitlist display could not be put into effect. (McNally Decl. ¶¶ 7, 9; Shamos Decl. ¶¶18-20).

It is not merely the physical characteristics of the waitlist display device which make the public display of the waitlist practical and effective in the modern poker room.  It is also "how" the information is displayed.  In order to display massive amounts of ever-changing data in an understandable and practical way, including multiple game types, there has to be a display of unique identifiers tied to particular players, yet the system must allow numerous player identifiers to be displayed concurrently in a way that will be meaningful to the players and to casino staff and all

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of which must be visible throughout the poker room.  (McNally Decl. ¶ 8).
Displaying multiple game types on the same physical display is the very narrow and
particular way recited in claims 1 and 27 to solve that problem.  This claimed waitlist
display functionality including multiple game display functionality is shown clearly in
the top rows in Figure 33 of the '969 patent.



**FIG. 33**

For example, "7 Card Stud" in the left-most column of the display shown in Figure 33
is an exemplary game type. There is a row below the game type display which shows
the tables on which the particular game type is currently being played, and beneath the
active tables for each game type, the unique identifiers for players who are waiting to

play the particular game types are shown. The other five columns to the right of the first "7 Card Stud" game show different poker game types, which in some instances is another "7 Card Stud" game with different betting limits.

All of the information contained in Figure 33 of the '969 patent is dynamic data and is shown on a single public display screen, and all of it is dependent on, *inter alia*, a player database and table availability database comprised of particular data structures to provide the particular displayed information. For example, it is readily apparent that limitations (j) of claim 1 and (h) of claim 27 require updating the table availability database when the system learns of a seat at a table being available. In order to do this, the system must know the status of the tables, what game type a particular table applies to and then associate that free seat at that free table of that game type with the longest-waiting player on the waitlist who wants to play that game type and then allocating that available seat to the particular player as recited in claim 1(f) and claim 27(g). Still further, claim 16 recites even further specificity, including the requirement of displaying the specific tables associated with each game type on the public display. Only through these uniquely recited limitations could the breakthrough improvements of the '969 claims be accomplished for the benefit of players and staff alike. None of this integrated and particularized functionality was disclosed or suggested by any alleged prior art cited by Defendants, nor was such integrated and particularized functionality known or conventional at the time. (McNally Decl. ¶¶ 8, 9; Shamos Decl. ¶¶18-20). The Supreme Court quite clearly held in *Alice v. CLS* that computer-implemented inventions are patent eligible where they "integrate the building blocks [of human ingenuity] into something more. *Alice v. CLS*, slip op at 6 (*citing Mayo*, 566 U.S. at __ (slip op. at 20)). "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010).

23

Still further, in addition to the multiple "inventive concepts" in the independent claims, there are numerous inventive concepts in the dependent claims that are each independently sufficient to confer patent-eligibility, some of which are discussed above. (*See* Shamos Decl. ¶¶21-47, 49-64). Ameranth has attached a chart (Exhibit A) that rebuts the arguments in Defendants' charts and explains why each of these independent claims is also patent-eligible under § 101.

Summary judgment cannot be granted where there are genuine issues of material fact as to an essential element of the required proof. Provided that the Court determines under "step 1" of the *Alice* framework that the claims are directed to "abstract" subject matter, it is essential that the Court conduct an analysis of what was conventional in the art at the time of the invention in order to determine whether the claimed subject matter is new and useful.[6] The scope of what was "conventional" is plainly disputed (with respect to, for example, the teachings of the Carson reference and the Hogan reference as they relate to poker rooms, as well as to numerous other aspects of the independent and dependent claims), and thus summary judgment would be inappropriate.

In sum, even if the Court finds under the first step of the *Alice* framework that the claims of the '969 are drawn to "abstract" subject matter, the Court should nonetheless find that the Defendants have failed to prove, by clear and convincing evidence, that there is not "inventive concept" in those claims which renders them patent-eligible.

---

[6] *Alice v. CLS*, Slip op. at 15 (quoting *Mayo v. Prometheus* as requiring an analysis of whether the claims are directed to something "[p]urely conventional" or "'well-understood, routine, conventional activit[ies]' previously known to the industry"); *see also id.* at 6, 11 ("[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept. '[A]pplication[s]' of such concepts "'to a new and useful end,'" . . . remain eligible for patent protection.") ("we must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application).

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '969 PATENT

**V.   CONCLUSION**

For the foregoing reasons, Ameranth respectfully requests that the Court deny Defendants' Motion for Summary Judgment based on 35 U.S.C. §101.

Dated: October 20, 2014                     witkowlaw, a professional law corporation

                                            By:   /s/ Brandon J. Witkow
                                                      Brandon J. Witkow


                                            OSBORNE LAW LLC
                                            John W. Osbore

                                            WATTS LAW OFFICES
                                            Ethan M. Watts

                                            MUNGER TOLLES & OLSON LLP
                                            Ted. G. Dane
                                            Peter E. Gratzinger

                                            *Attorneys for Plaintiff & Counter-Defendant*
                                            AMERANTH, INC.


[*Additional Counsel Continued*]

WATTS LAW OFFICES                           MUNGER TOLLES & OLSON LLP
Ethan M. Watts (SBN: 234441)                Ted G. Dane (SBN #143195)
emw@ewattslaw.com                           ted.dane@mto.com
12340 El Camino Real, Suite 430             Peter E. Gratzinger (SBN #228764)
San Diego, California 92130                 peter.gratzinger@mto.com
Tel:   (858) 509-0808                       355 S. Grand Ave., 35th Floor
Fax:   (619) 878-5784                       Los Angeles, CA 90071
                                            Telephone:   (213) 683-9513